# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re: Patricia Angelica Murphy                    Case No. 15-11240-j7

---

PATRICIA ANGELIA MURPHY,

    *Plaintiff*

    v.                                        Adversary Pro. No. 15-1051-j

UNITED STATES OF AMERICA,
*THROUGH ITS AGENCY, U.S. DEPARTMENT OF EDUCATION*;
NEW MEXICO STUDENT LOAN GUARANTEE CORPORATION;
NEW MEXICO EDUCATIONAL ASSISTANCE FOUNDATION,
*AKA NEW MEXICO STUDENT LOANS*

    Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court following a two-day trial on the merits to determine whether the Plaintiff's student loans are dischargeable under 11 U.S.C. § 523(a)(8).[1] Counsel at the trial appeared as indicated on the record. The Court took the matter under advisement. After reviewing the law, the evidence, and being otherwise informed the Court has determined Ms. Murphy's student loans are an undue hardship to her and her dependents and therefore should be discharged under § 523(a)(8).

## <u>PROCEDURAL HISTORY</u>

On May 14, 2015 the Plaintiff, Ms. Patricia Angelica Murphy, commenced a voluntary chapter 7 case. *See* Docket No. 1, Case No. 15-11240. Ms. Murphy received a discharge in her chapter 7 case. *See* Docket No. 14, Case No. 15-11240. On July 2, 2015 Ms. Murphy filed this

---

[1] Unless otherwise indicated, all references to the "Bankruptcy Code" or the "Code" refer to Title 11 of the United States Code. All references to "Bankruptcy Rules" or the "Rules" refer to the Federal Rules of Bankruptcy Procedure.

adversary proceeding against the United States Department of Education ("US-DOE") and New

Mexico Student Loans ("NM Student Loans") seeking to discharge her student loan debt under §

523(a)(8). *See* Docket No. 1.[2]

The Court denied the parties' cross-motions for summary judgment on the issue of

whether the student loan debt represented an undue hardship under § 523(a)(8). *See* Docket No.

23. The Court granted summary judgment on the issue of whether the loans the Debtor seeks to

discharge are educational loans under § 523(a)(8), finding that they are educational loans. *Id.* On

February 10, 2017, the Court entered an Order Deeming Facts Established for All Purposes.[3] *See*

Docket No. 24. The Court held a trial on the merits on December 8, 2017, and heard closing

arguments on December 11, 2017. *See* Docket Nos. 41 and 42. At trial, the Court admitted all

exhibits into evidence without objection. *See* Docket No. 41.

FACTS

The Court makes the following findings of fact.

*A. Ms. Murphy's Family*

At the time of the trial, held in December 2017, Ms. Murphy was 58 years old. In 2008,

Ms. Murphy and her husband, Mr. Joseph Murphy, divorced. Ms. Murphy has four children with

Mr. Murphy: Son A, Son B, Son C and Son D.[4]

*1. Mr. Joseph Ralph Murphy*

Mr. Murphy is 76. In 2013, about five years after Mr. and Ms. Murphy divorced, Mr.

Murphy suffered a stroke that paralyzed his left side. He is confined to a wheel chair. Since Mr.

Murphy left the hospital, Ms. Murphy has been taking him to therapy four times a week.

---

[2] Unless otherwise stated, references to docket numbers refer to the docket in this adversary proceeding.
[3] The Order Deeming Facts Established for All Purposes allowed a party to raise a timely objection to any fact deemed established. No objection was raised by any party.
[4] The testimony relating to Son A was placed under seal; the Court will refer to Ms. Murphy's sons in this manner to protect the privacy of Son A.

-2-

Following Mr. Murphy's stroke, Ms. Murphy has been his main caregiver, helping him with his general basic needs. Ms. Murphy lives around the block from Mr. Murphy. She gets him out of bed and dresses him, prepares his meals, bathes him once a week, does his food shopping, takes him to his doctor's appointments, and picks up his medication. Ms. Murphy will continue to care for Mr. Murphy for the foreseeable future. Their sons take care of Mr. Murphy on weekends.

Mr. Murphy has not worked since his stroke. Prior to that he worked for the federal government at the United States District Court for the District of New Mexico. Mr. Murphy lives on his own and pays his own rent. While Mr. Murphy was in the hospital, Ms. Murphy added him to her cellular phone plan, which she continues to pay. Given Mr. Murphy's continuing disability, Ms. Murphy pays the phone bills because it gives her peace of mind to know that Mr. Murphy can reach her in an emergency. During the holiday season, Mr. Murphy gave Ms. Murphy some financial assistance to help pay for gifts for their children and food for their family. He does not otherwise compensate Ms. Murphy for the care she provides him.

2.  *Son A*

Ms. Murphy's Son A is in his twenties. He has severe depression, anxiety, and Obsessive-Compulsive Disorder. Son A has attempted suicide four times. He has been hospitalized for his mental illness. Son A currently is not on anti-depressants or other medication for his illness because the medication increased his suicidality. Ms. Murphy frequently has to leave work to care for Son A when he is unwell. Although Son A has had part-time jobs, he is unable to support himself. He is currently unemployed after leaving his job at a retail store due to his mental illness. He will remain Ms. Murphy's dependent for the foreseeable future.

On cross-examination, counsel for US-DOE questioned Son A about whether he would be willing to apply for Social Security disability benefits to help his family financially. Son A expressed that he did not want to apply for Social Security disability benefits because he wants to

find work and does not want the stigma of being labeled as disabled. When told on cross examination that Social Security disability benefits do not preclude him from working and remain confidential, Son A said he would consider applying for them. Based on the evidence before the Court, the Court cannot make any findings regarding whether Son A will apply for or be granted Social Security disability benefits or in what amount, or to what extent his receipt of such benefits would improve Ms. Murphy's financial situation.

### 3. Son B

Ms. Murphy's Son B lives with her and Son A. Ms. Murphy pays $600.00 and Son B pays $900.00 per month for rent.[5] In 2005, Ms. Murphy started taking out parental student loans to offset Son B's cost of attending college. At the time, Ms. Murphy was doing well financially, had the financial ability to make payments on student loans, and thought that taking out the parental student loans would allow her son to graduate without debt from college. Son B attended the University of Redlands for two years and Regis University for two years. He chose to attend those universities, in part, to continue to play soccer in college. Son B has a Bachelor's of Arts in Spanish and a Master's degree in Latin American Studies. Son B obtained his own student loans to pay for his Master's degree. He works at Alta Mira Specialized Family Services, Inc., a not for profit organization, in Albuquerque ("Alta Mira").

### 4. Son C

Ms. Murphy's son, Son C, is currently attending college while supporting himself. He works part time at Alta Mira. When Son C was a minor, Ms. Murphy obtained life and car insurance for him. Ms. Murphy still maintains a life insurance policy for Son C that costs around $21.00 a month. Son C is also still a driver covered under Ms. Murphy's car insurance policies.

---

[5] When Son A was working he paid $200.00 per month in rent, reducing Ms. Murphy's share.

-4-

*5. Son D*

No evidence regarding Son D was presented at trial.

*B. Ms. Murphy's Education and Student Loans*

In 2007, when she was in her mid-forties, Ms. Murphy decided to obtain an associate's degree as a surgical assistant. She was looking to improve her job prospects and have a career. She took out student loans to cover the cost of her education at Central New Mexico Community College ("CNM"). Ms. Murphy attended CNM until 2012, when she graduated with surgical assistant training and with an Associate's Degree in Liberal Studies.

Ms. Murphy is liable for student loans both for her education and for Son B's undergraduate education. As of November 30, 2017, under the William D. Ford Direct Loan Program, Ms. Murphy owes the United States $126,543.64 for student loans; interest accrues at a rate of $22.70 per day. She has made payments on those loans amounting to $527.68. As of November 30, 2017, under the Federal Stafford Loan Program, Ms. Murphy owes $4,422.98; interest accrues on that debt at a rate of $0.74 per day. She has made payments on that debt amounting to $42.00. Ms. Murphy consolidated her loans from the US-DOE several times. When she consolidated her loans all previous payments were credited to determine the new loan balance. Ms. Murphy's total payments on loans to the US-DOE as stated above are based only on payments made after she consolidated her loans.

As of December 7, 2017, Ms. Murphy owed NM Student Loans $35,330.42. Interest accrues on that debt at a daily rate of $5.57. Ms. Murphy has made payments of $252.84 on the loans to NM Student Loans.

Ms. Murphy has worked with the US-DOE and NM Student Loans on different repayment options for her student loans. Payments on the loans were deferred while she was attending school. Since graduating, Ms. Murphy has sought forbearances, deferments, and was

-5-

placed on income based repayment "IBR" plans. An IBR plan allows a borrower to repay the student loan based on income. Based on a number of factors including which IBR plan the borrower selects, the borrower's income, the poverty line where the borrower lives, and the loan amount, the U.S. Department of Education calculates a repayment amount. The repayment amount is recalculated each year. When Ms. Murphy filed her bankruptcy case the amount she owed each month under her IBR plans was $0.00. Ms. Murphy was on separate IBR plans for loans from the US-DOE and NM Student Loans.

At the time of trial if Ms. Murphy were to enter into IBR plans, the amount owed each month would be $0.00 to the US-DOE and $0.00 to NM Student Loans. Under Ms. Murphy's circumstances it is unlikely that the amount owed each month under the IBR plans would be more than $0.00 in the foreseeable future. The interest on the student loans amortizes each year and is added to the principal during the repayment period. This amortization likely will leave Ms. Murphy with a significant amount of debt to be forgiven at the end of the IBR plan repayment periods if the student loan debt is not discharged in bankruptcy. The US-DOE projected in 2015 that to pay her student loans in full Ms. Murphy would need to pay at least $1,147.40 per month for 137 months. Ms. Murphy cannot make such a payment today. Based on her reasonably foreseeable circumstances it unlikely that the amount owed by Ms. Murphy each month under an IBR plan will ever be more than zero dollars per month.

Ms. Murphy does not feel that applying for an IBR every year is stressful. However, Ms. Murphy is stressed and is quite wary of the prospect of the tax debt she will face at the end of the repayment periods when the student loan debts are forgiven. She has sincere consternation with the fact that she could be exchanging one debt she could not pay for another debt that she could not pay. It is speculative for the Court to find that Ms. Murphy's debt forgiveness would result in

taxable income. However, to the extent Ms. Murphy is able to accumulate any sort of net worth for her later years, it will result in taxable income when her student loan debts are forgiven at the end of an IBR plan repayment period.

### C. Ms. Murphy's Employment History

From 2000 until she was fired in 2010, Ms. Murphy worked at the Range Café as a waitress. She valued her job at the Range Café because it provided benefits. During that time Ms. Murphy's salary averaged over $30,000 per year. Ms. Murphy lost her job at the Range Café in 2010 when she traveled to Chile to care for her grandmother who was ill. Ms. Murphy cashed out her 401(k) savings to afford the trip. When she returned from Chile she became a full time student at Central New Mexico Community College.

After completing her associate's degree in 2012, Ms. Murphy found work as a surgical assistant. Because of Son A's mental health issues she was not able to fully concentrate on her work and made mistakes in the operating room. After a few months, she was fired from her job as a surgical assistant. Despite spending a year unemployed searching for work and applying for jobs as a surgical assistant, Ms. Murphy was not able to find work in that field. Ms. Murphy does not feel she can move to look for work as a surgical assistant because she is the main caretaker of Son A and Mr. Joseph Murphy. In addition, Ms. Murphy is deeply concerned that if she is not there for Son A, he will commit suicide. She does not feel she could ask either Son A or Mr. Joseph Murphy to move. Further, it does not appear Ms. Murphy would find employment as a surgical assistant even if she tried. She is no longer licensed to work as a surgical assistant and will not be able to use her degree to find work in that field.

When her unemployment benefits ran out, Ms. Murphy returned to the service industry and found part-time work in October, 2012 as a waitress at Church Street Café. From 2013 until 2017, Ms. Murphy also worked in the evenings as a banquet staff member. Ms. Murphy rides a

bicycle to work to save money. In 2017, Ms. Murphy broke her elbow while riding a bicycle to work and had to take time off from work. She was granted worker's compensation benefits totaling $2,906.34 while she was unable to work. Once she had recovered enough to do some work, Ms. Murphy worked three days a week as a hostess at Church Street Café, which was a substantial pay cut compared to her waitressing position. After she recovered, Ms. Murphy was no longer physically able to work as a banquet waitress and cut back to only waitressing at Church Street Café. She values her position at Church Street Café because it pays well under her circumstances and gives her the flexibility to leave as necessary to care for Son A. It is unlikely that Ms. Murphy will work outside of the service industry or increase her income for the remainder of her career.

Ms. Murphy has maximized her income. In 2016, Ms. Murphy earned total of $21,517.00, averaging $1,793.10 per month.[6] At fifty-eight years old she is no longer able to work twelve hour shifts and multiple jobs. Ms. Murphy has continued to apply for other waitressing jobs hoping to find full time employment with retirement benefits, but without success. She plans to continue working as a waitress until she can no longer handle the physical requirements of the job. Ms. Murphy has no retirement savings. Except for social security income, Ms. Murphy will have no means to support herself once she can no longer work.

Table 1. This Table reflects Ms. Murphy's Annual Salary.

| Year | Income |
|------|--------|
| 2010 | $39,284 |
| 2011 | $32,755 |
| 2012 | $16,940 |
| 2013 | $17,978 |
| 2014 | $21,795 |
| 2015 | $22,577 |

---

[6] Ms. Murphy testified that her monthly pay varies given the season with greater monthly income during tourist season. The Court will use the average monthly income for ease of calculation.

| 2016 | $21,517 |
| 2017[7] | $9,198 |

Table 2. This Table reflects Ms. Murphy's assets as of the time she filed her bankruptcy case.

| Personal Property | |
|---|---|
| Cash | $5.00 |
| Checking account | $380.00 |
| Security deposit | $1.00 |
| Furniture | $3000.00 |
| Housewares | $1000.00 |
| Books and paintings | $600.00 |
| Clothing | $400.00 |
| Jewelry | $200.00 |
| Automobiles | $3945.00 |
| Total | $9531.00 |

D. *Ms. Murphy's Budget*

Ms. Murphy lives within a frugal budget. At trial, Ms. Murphy had ten dollars in her savings account, no retirement accounts and no investments. She cares for herself and Son A on her limited income. She shops for food using coupons and rarely eats out. She applies for and receives food stamps.[8] She also rides her bike to work and tries to limit when she drives to save on gas and parking. In 2016, she spent an average of $572.00 per month on food and gas for herself and Son A. She maintained a Costco membership at $5.00 per month. Her additional travel costs per month amounted to approximately $67.00. In 2016, Ms. Murphy paid $25.00 in continuing education related to her waitressing job.

Ms. Murphy shares an apartment with Son A and Son B. Ms. Murphy pays $600.00 per month in rent, Son B covers the remaining rent. She spends approximately $47.00 per month on household items and prescriptions for herself and Son A. Her portion of the utilities amounted to

---

[7] The Court only has evidence regarding Ms. Murphy's salary through September 2017. In addition, Ms. Murphy's salary was significantly lower in 2017 due to her elbow injury. The salary information for 2017 includes her workers compensation benefits as well as Ms. Murphy's salary from Church Street Café for her work as a hostess and a waitress.
[8] Ms. Murphy was denied food stamps while Son A was working part time due to the increased household income.

-9-

$22.00 per month. Her entertainment costs for herself and Son A include wireless internet costs and occasionally eating out, which totals around $84.75 per month. Ms. Murphy and Son A's personal costs and her gifts for her four sons have amounted to approximately $50.00 per month.

Table 3. This Table reflects Ms. Murphy's average monthly income and expenses from 2014-2016.[9]

| Averaged per Month | 2014 | 2015 | 2016 |
|---|---|---|---|
| **Income** | **$1,816.25** | **$1,881.417** | **$1,793.083** |
| *Expenses* | *$1,696.75* | *$1,990.833* | *$1,858.417* |
| Difference | $119.5 | -$109.42 | -$65.33 |

Table 4. This Table reflects Ms. Murphy's yearly income and expenses from 2014-2016

| Yearly Totals | 2014 | 2015 | 2016 |
|---|---|---|---|
| **Income** | **$21,795** | **$22,577** | **$21,517** |
| *Rent* | *$7,028* | *$7,200* | *$7,200* |
| *Food/Gas* | *$4,904* | *$7,350* | *$6,869* |
| *Household/Prescriptions* | *$274* | *$692* | *$566* |
| *Utilities* | *$279* | *$148* | *$268* |
| *Membership* | *$56* | *$296* | *$60* |
| *Continuing Education* | *$0* | *$82* | *$25* |
| *Student Loan Payments* | *$470* | *$676* | *$212* |
| *Insurance* | *$503* | *$1,523* | *$2,199* |
| *Cell Phone* | *$1,478* | *$1,838* | *$2,179* |
| *Gifts/Personal* | *$175* | *$463* | *$596* |
| *Entertainment (WIFI, eating out)* | *$821* | *$1,323* | *$1,017* |
| *Lodging/Travel* | *$61* | *$359* | *$810* |
| *Savings* | *$100* | *$450* | *$300* |
| *Credit Card Payments* | *$4,212* | *$1,490* | *$0* |
| Difference | $1,434 | -$1,313 | -$784 |

E. *Ms. Murphy's Future Financial Situation*

Ms. Murphy's financial situation from her own earnings is not likely to change over the repayment period of her loan. Her position as a waitress at Church Street Café allows her the

---

[9] Ms. Murphy's Schedule J shows she had a net surplus income of $244.00 per month as of the petition date. Ms. Murphy's schedules contain several discrepancies that bring their reliability into question. At trial Ms. Murphy produced evidence that tracked her budget from 2014 to 2016. Because the Court has determined that the budgets shown in in the Tables are more reliable, the Court finds that those budgets rather than Schedule J reflect her actual income and expenses. The trial evidence showed that on average in 2016 Ms. Murphy's monthly expenses were $65.33 more than her monthly income.

flexibility she needs to care for Mr. Joseph Murphy and Son A. Because she is the main caregiver for Mr. Joseph Murphy and Son A, Ms. Murphy will not look for work outside of Albuquerque, New Mexico.

Ms. Murphy's work as a waitress depends on her physical capability to handle the position. Ms. Murphy has already had to cut back on her work because she could not handle the physical demands of the position. In addition, Ms. Murphy believes her inability to find full-time work as a waitress may in part be to her age. She testified that at least one manager has told her that when hiring new wait staff, younger candidates are preferred.

If Ms. Murphy were to continue to pay under the IBR plans, her repayment period could last up to twenty-five years, at which point she would be 83 years old. It is likely that Ms. Murphy will have to stop working as a waitress well within the repayment period of her loans. When she stops working, Ms. Murphy will likely be on a fixed income of Social Security benefits, as she has no retirement savings. There is no reasonable prospect that Ms. Murphy would ever be required to make any payments under an IBR plan until her student loans were forgiven.

<u>DISCUSSION</u>

The Court makes the following conclusions of law.

A.  <u>Undue Hardship Standard</u>

Under the Bankruptcy Code, student loan debt is excepted from discharge under § 523(a)(8) unless the debtor proves "excepting [the] debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The undue hardship inquiry is demanding. *See Richardson v. N. Carolina State Educ. Assistance Auth.*, 2008 WL 7663939, at *1 (E.D.N.C. 2008), aff'd sub nom. *In re Richardson*, 326 F. App'x 173 (4th Cir. 2009); *In re Weldon*, 2008 WL 4527654, at *5 (Bankr. W.D. Wash. 2008) ("Congress

-11-

has intentionally chosen to impose demanding requirements for the dischargeability of student loans."), *aff'd*, 2009 WL 1034928 (W.D. Wash. 2009). Discharging student loan debt is, therefore, the exception, not the rule. *See In re Mersmann*, 505 F.3d 1033, 1042-43 (10th Cir. 2007) (observing that "student loans may not be discharged . . . except for the *one* narrow circumstance when 'excepting such debt from discharge . . . would impose an *undue hardship* on the debtor and the debtor's dependents.'") (emphasis in *Mersmann*) (quoting 11 U.S.C. § 523(a)(8)), *abrogated on other grounds by United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 270, (2010); *In re Mosley*, 494 F.3d 1320, 1324 (11th Cir. 2007) (stating that "[t]he Bankruptcy Code provides that student loans generally are not to be discharged" and describing § 523(a)(8) as a "narrow" exception).

Section 523(a)(8) does not define undue hardship.[10] The Tenth Circuit uses the test set out in *In re Brunner*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd sub nom. Brunner v. New York State Higher Educ. Servc. Corp.*, 831 F.2d 395 (2d Cir. 1987) (the "*Brunner* test") to determine whether repayment of the debt will impose an undue hardship. *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1307 (10th Cir. 2004) (adopting the *Brunner* test). The *Brunner* test requires the Court to find:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* (quoting *Brunner*, 46 B.R. at 756). The debtor must prove each prong of the test by a preponderance of the evidence. *Polleys*, 356 F.3d at 1307.

When applying the *Brunner* test, the Tenth Circuit has cautioned that "to better advance

---

[10] Under § 524(k)(6)(A), in the context of reaffirming a debt, a presumption of undue hardship arises when the debtor's "income less [his] monthly expenses does not leave enough to make the payments."

the Bankruptcy Code's fresh start policy . . . the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged." *Id.* at 1309 (internal quotations omitted).

Ms. Murphy argues that she met her burden of proof under the *Brunner* test and has shown that her student loans represent an undue burden and should be discharged. The Defendants argue that Ms. Murphy cannot meet the first prong of the *Brunner* test because under an IBR plan her payments would be zero dollars per month. Under the Defendant's reasoning, where the "payment" under an IBR plan is zero dollars per month, a debtor cannot show an inability to maintain a standard of living if forced to repay the loan. In addition, Defendants assert that Ms. Murphy cannot satisfy the third, good-faith prong of the *Brunner* test because Ms. Murphy is seeking to discharge student loans rather than use an IBR plan.

The Court does not agree that a debtor's eligibility for an IBR plan automatically renders a debtor ineligible to receive a student loan debt discharge under § 523(a)(8). *See In re Roe*, 295 F. App'x 927, 931 (10th Cir. 2008) (unpublished) ("The undue-hardship analysis evaluates whether a debtor's loan debt may be discharged, not whether a debtor should participate in a repayment plan. Because a debtor's willingness to participate in a repayment plan is an important indicator of good faith, [the] refusal to consolidate her loans is one more factor indicating a lack of good faith.") (quoting *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005)). Willingness to participate an IBR plan is nevertheless an important factor for the Court to consider in analyzing undue hardship.

Even though Ms. Murphy is eligible for an IBR plan that will likely require a payment of zero dollars per month during the periods of loan repayment, and would stay on IBR plans if her student loan debt is not discharged, the Court is persuaded that her student loans represent an

-13-

undue hardship under the *Brunner* test. In reaching this decision, the Court is relying on the unique circumstances of this case including but not limited to: (1) Ms. Murphy's age and physical condition; (2) Mr. Joseph Murphy's severe disability and Son A's mental illness and suicidality and Ms. Murphy's substantial role in caring for them; (3) Ms. Murphy's limited prospects for future employment given the flexible work hours Ms. Murphy needs to care for Son A; (4) Ms. Murphy's income and frugal expenses; (5) Ms. Murphy's eligibility to pay zero under IBR plans, which likely would never change; and (6) Ms. Murphy's previous efforts to use repayment plans, consolidate her loans, and enter deferments or forbearances. The Court is also taking into account the tax law under which debt forgiveness results in taxable income. The Court will therefore discharge her student loans under 11 U.S.C. § 523(a)(8).

1. *Part I of the Brunner Test: minimal standard of living based on current income and expenses*

The first part of the *Brunner* test directs the Court to determine "whether the debtor can maintain a minimal standard of living while repaying the debt." *Polleys*, 356 F.3d at 1309. In making this determination, the Court considers "all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level." *Id.*

A minimal standard of living means the Debtor must show she is "living within the strictures of a frugal budget." *Educ. Credit Mgmt. Corp. v. Murray*, 2017 WL 4222980, at *2 (D. Kan. 2017). A frugal budget is that which is "minimally necessary to see that the needs of the debtor and [her] dependents are met for care, including food, shelter, clothing, and medical treatment." *In re Watson*, 2012 WL 5360949, at *2 (Bankr. D. Kan. 2012) (quoting, *In re Innes*, 284 B.R. 496, 504 (D. Kan. 2002)); *see also In re Buckland*, 424 B.R. 883, 889 (Bankr. D. Kan. 2010) ("a court should also be hesitant to impose a spartan life on family members who do not personally owe the underlying student loan, particularly when those family members are

-14-

children."). A minimal standard of living is "more than simply tight finances, though not utter hopelessness." *Buckland*, 424 B.R. at 889.

Ms. Murphy asserts that she has shown she is living within a frugal budget and her financial situation is worse than mere tight finances. Defendants challenge several aspects of Ms. Murphy's budget. Defendants point out that Ms. Murphy covers the cost of her ex-husband, Mr. Joseph Murphy's, cell phone, maintains an insurance policy that includes car insurance and life insurance for Son A and Son C, and renter's insurance. Defendants argue that if Ms. Murphy were to stop paying for Mr. Joseph Murphy's cell phone and only maintain insurance for herself she could further minimize her expenses.

The fact that Ms. Murphy pays for Mr. Joseph Murphy's cell phone and has continued to cover the cost of her sons' insurance fails to show she is not living within the strictures of a frugal budget. Paying for Mr. Joseph Murphy's cell phone expense is not unreasonable given that Ms. Murphy added him to her cellular plan when he had his stroke, Mr. Murphy's continuing disability, and the peace of mind it gives her to know that Mr. Murphy can reach her in an emergency. In addition, including Son C on life and automobile insurance is not a significant cost. She shares an apartment with two of her sons who contribute to rent which enables her to pay no more than six hundred dollars per month for rent. She rides her bicycle to work, and only uses a car when necessary to save on gas. She has been on food stamps, uses coupons when she shops, and rarely eats out.

Despite these cost-saving efforts, Ms. Murphy's current budget is short each month. She depends on family to offset the cost of housing. She participates in government programs to afford healthcare, food, and utilities. In light of this evidence, the Court finds that Ms. Murphy cannot maintain a minimal standard of living for herself and her dependent based on her current

-15-

financial situation if forced to repay the loans, even if under an IBR plan, her payments would be zero dollars per month. The Court concludes that Ms. Murphy has satisfied the first prong of the *Brunner* test.

2. *Part II of the Brunner Test: additional circumstances exist indicating that this state of affairs is likely to persist*

Under the second part of the *Brunner* test, the Court considers the debtor's future financial position and the facts and circumstances that affect that position. The Tenth Circuit does not require a "certainty of hopelessness" when considering the debtor's future financial prospects. *Polleys*, 356 F.3d at 1310. To determine whether additional circumstances indicate that the debtor's inability to maintain a minimal standard of living will persist over a significant portion of the repayment period, the Court looks "into [the] debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like." *Id.* This is a fact driven inquiry; the Court will not base its analysis on "unfounded optimism." *Id.*

The Defendants did not specifically challenge whether Ms. Murphy's current financial state of affairs is likely to persist. Nevertheless, based on the evidence presented, the Court has found additional circumstances exist indicating that Ms. Murphy's current state of affairs is likely to persist for the repayment period of the student loans.

Ms. Murphy is 58 and has already had to cut back on the hours she works as a waitress because of her physical limitations. Under an IBR plan, she would have up to 25 years of repayment on the loans. Ms. Murphy will work for as long as she is able, but it appears unlikely Ms. Murphy will still be working into her 80s. She has no savings and no retirement accounts or pension. As such, it is likely that her financial situation will get worse over the repayment period of the loan.

In addition, Son A is likely to remain Ms. Murphy's dependent over the repayment period

-16-

of the loans. His mental health issues are very serious, he has been unable to maintain stable employment because of his illness, and Ms. Murphy's job prospects are limited by her need for flexibility to go home to care for Son A as necessary. These additional strains on Ms. Murphy's financial prospects establish that her current inability to maintain a minimal standard of living will likely persist during the repayment periods of the loans. The Court, therefore, concludes that Ms. Murphy has satisfied the second prong of the *Brunner* test.

### 3. Part III of the Brunner Test: good faith effort to repay the loan

Under the third part of the *Brunner* test, the Court considers whether the debtor has made a good faith effort to repay the student loans. In the Tenth Circuit, this inquiry focuses on "whether the debtor is acting in good faith in seeking the discharge, or whether [she] is intentionally creating [her] hardship." *Polleys*, 356 F.3d at 1310. When determining good faith courts cannot "impose their own values on a debtor's life choices." *Id*. "[T]he good faith part can be satisfied by a showing that [the debtor] is actively minimizing current household living expenses and maximizing personal and professional resources." *Id.* at 1312. In *Polleys*, the Tenth Circuit found that the debtor's good faith was shown by the facts that: (1) the debtor did not seek a student loan discharge immediately after the first payment under the loan was due; (2) she made efforts to cooperate with the lender by taking advantage of consolidation and deferral programs; (3) her failure to increase her income was due to her mental health condition, which was beyond her control; and (4) she was not attempting to abuse the student loan system by having loans forgiven before embarking on a lucrative career. *Id.*

Ms. Murphy has maximized her income. There is no realistic prospect that she will materially increase her income during the repayment period of her student loans. She is unable to obtain a job in the field for which her student loans funded her education. She lost her job as a surgical assistant because of the mistakes she made in the operating room due to stress caused by

-17-

Son A's mental illness. To obtain employment in her trained field, Ms. Murphy would need additional certifications. Her age also impedes her ability to obtain employment as a surgical assistant due to the physical demands of the job. By waitressing at Church Street Café, Ms. Murphy has done the best she can to obtain employment that provides her with income and affords her the flexibility she needs to care for Son A. She must be available to care for Son A as needed, which happens frequently.

Ms. Murphy provides daily care for Mr. Joseph Murphy. Theoretically, the time she spends getting Mr. Murphy out of bed, dressing and bathing him, shopping for his food, preparing his meals, and taking him to therapy could be devoted to a paying job. However, even though the parties stipulated that Mr. Joseph Murphy is not Ms. Murphy's dependent, the Court will not find that Ms. Murphy's self-sacrifice in caring for her former husband and the father of her four sons who suffers from severe paralysis means Ms. Murphy has not done all she can to maximize her income.

Ms. Murphy has minimized her expenses within reason. The only expenses the Defendants' challenged were Ms. Murphy's payment of Mr. Joseph Murphy's cell phone and Son C's insurance. Ms. Murphy put Mr. Joseph Murphy on her cell phone plan when he suffered his stroke to ensure that he could communicate with her in case of emergency, and she has continued to cover the minimal cost of the additional line. Ms. Murphy took out the insurance when Son C was a minor; she has simply continued to cover the cost. Ms. Murphy could save money by insisting that Mr. Joseph Murphy pay for his own cell phone plan and requiring Son C pay for his own car insurance. However, the Court finds that Ms. Murphy's continuing payment of these limited expenses for family members does not negate Ms. Murphy's good faith efforts to repay her student the loans given her financial circumstances. *See Polleys*, 356 F.3d at 1308

-18-

(characterizing the holding that a "debtor, who had nerve damage, bronchitis, and arthritis, and whose daughter had epilepsy, mother had cancer, and grandchildren had asthma, failed good faith prong because [s]he intentionally chose to help her family financially" as "an overly restrictive interpretation of the *Brunner* test").

Ms. Murphy currently qualifies for partial Medicaid, participates in a program that allows her to pay a set rate for utilities, and has qualified to receive food stamps from time to time.[11] She uses coupons when she shops and rarely eats out. She bikes to work to save on gas and parking. She lives with two of her sons to keep her housing costs low. The Court has found based on the evidence presented that Ms. Murphy has maximized her income and minimized her expenses.

Defendants also take issue with Ms. Murphy obtaining student loans for her son's education, suggesting that this fact indicates Ms. Murphy has not acted in good faith. In retrospect, it may not have been the wisest financial decision for Ms. Murphy to seek to pay for her son's college education. However, at the time she took out the student loans for her son in 2005, Ms. Murphy's income was significantly higher and she had a substantially greater ability to repay the loans. In any event, "bad judgment is not bad faith." *In re Gubrath*, 526 B.R. 863, 870 (D. Colo. 2014). In addition, examining why Ms. Murphy chose to take out student loans to cover the cost of her son's education would impermissibly impose the Court's values on her life choices. *Polleys*, 356 F.3d at 1310 ("Good faith . . . should not be used as a means for courts to impose their own values on a debtor's life choices.").

Defendants also argue that Ms. Murphy cannot meet the good faith prong because under

---

[11] In 2017 while Son A was working part-time, Ms. Murphy did not qualify for food stamps because their household income was more than the limit per month. Ms. Murphy testified that as Son A had lost his job, she would once again qualify for food stamps and would be applying for them.

an IBR plan her payments would be zero dollars per month. The Defendant's legal theory is that eligibility to participate in an IBR plan by itself forecloses a debtor from an undue hardship discharge in bankruptcy because the IBR plan adjusts the required payment to prevent an undue hardship. The Court does not agree.

Ms. Murphy's eligibility to participate in IBR plans does not by itself foreclose her from obtaining an undue hardship discharge in bankruptcy. There is no per se rule that eligibility to participate in an IBR plan means a debtor can never prove good faith. *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005) ("The Bankruptcy Court recognized that participation in a repayment program is not required to satisfy the good-faith prong of the *Brunner* test. The court, however, considered this factor an important indicator of good faith. We agree with the Bankruptcy Court on this score.") (internal quotations and citations omitted).

Despite the existence of income based repayment options under the William D. Ford program, Congress has not repealed the undue hardship discharge in contained § 523(a)(8). *See In re Barrett*, 487 F.3d 353, 364 (6th Cir. 2007) ("Had Congress intended participation in the ICRP-implemented in 1994-to effectively repeal discharge under § 523(a)(8), it could have done so."); *Krieger v. Educational Credit Management Corp.*, 713 F.3d. 882, 884 (7th Cir. 2013) (to the extent that the district judge thought that debtors always must agree to a payment plan and forgo a discharge, that is a proposition of law—an incorrect proposition."); *In re Marshall*, 430 B.R. 809, 815 (Bankr. S.D. Ohio 2010) ("If Congress had wanted to repeal undue hardship because of any type of income based or income contingent plan, it could have done so. The *Brunner* test and the § 523(a)(8) undue hardship language both remain intact. The existence of the IBR does not change the analysis."); *In re Abney*, 540 B.R. 681, 688 (Bankr. W.D. Mo. 2015) ("Holding that eligibility for a program such as IBRP ipso facto leads to denial of an

-20-

undue hardship discharge would deprive the Court of the discretion granted by § 523(a)(8).").

The Court holds that a debtor's ability to participate in an IBR plan does not prevent a debtor from obtaining a hardship discharge of her student loan debt at least when: (a) the debtor has demonstrated a willingness to participate in an IBR plan or alternate repayment option prior to bankruptcy;[12] (b) the debtor has made reasonable efforts to maximize her income and minimize her expenses; (c) there is no realistic prospect the debtor would ever be required to make any payment on the student loan debt under an IRB plan as those plans are currently designed; (d) there are negative consequences to the debtor by denying the student loan hardship discharge; and (e) the debtor otherwise has demonstrated good faith. No purpose would be served by denying a student loan discharge when the debtor meets these conditions even though the debtor is eligible to participate in an IBR plan.

For a debtor who meets these conditions, as the Ninth Circuit Bankruptcy Appellate Panel explained:

> Perhaps more concretely, we see no real purpose in making Debtor jump through the hoops of applying for, and enrolling in, the IBRP and then reporting her income every year. The IBRP was set up to allow borrowers to pay an affordable amount toward retirement of their student loan debt. However, when absolutely no payment is forecast, the law should not impose negative consequences for failing to sign up for the program. This is consistent with the general maxim that the law does not require a party to engage in futile acts.

See In re Roth, 490 B.R. 908, 920 (B.A.P. 9th Cir. 2013).

The Court has found that Ms. Murphy has demonstrated a willingness to participate in IBR plans prior to her bankruptcy case and that she made some payments on her student loans. She worked with the Defendants to consolidate her loans and enter deferments or forbearances.

---

[12] A debtor's willingness to participate in an IBR plan or "alternate repayment option prior to bankruptcy" is an important indicator of good faith. *In re Roe*, 295 F. App'x at 931 (10th Cir. 2008) (unpublished); *see also In re Buckland*, 424 B.R. at 894 ("Debtor's refusal to consider the William D. Ford ICRP or IBR also supports a finding that he has not made a good faith effort to repay the student loan debt.").

-21-

In fact, she previously enrolled in an IBR plan. At trial, Ms. Murphy testified that if her loans were not discharged she would be willing to participate in IBR plans. This evidence establishes that Ms. Murphy has adequately sought alternate repayment options before seeking to discharge her student loans through bankruptcy. Ms. Murphy has maximized her income and has minimized her expenses by living within a frugal budget and there is no realistic prospect that Ms. Murphy would ever be required to make any material payment on her student loan debt if she continuously enrolled in an IRB plan until her student loans were forgiven at the end of a 20 or 25-year term. The evidence also establish that Ms. Murphy otherwise has demonstrated good faith.

In addition, there would be negative consequences to Ms. Murphy by denying the student loan hardship discharge. First, she would be required to jump through the hoops of applying each year to enroll in IBR plans. Second, the amount of her student loans debt would increase due to accruing interest which could negatively affect her credit. Third, she would have the potential for discharge of indebtedness tax liability that she could not pay upon the eventual forgiveness of her student loans when she is in her eighties. Finally, she would live with the stress of mounting student loan debt and the potential for exchanging one debt she cannot pay (the student loan debt) for another she cannot pay (tax debt resulting from forgiveness of the student loan debt).

As explained by the bankruptcy court in *In re Fern*, participating in an IBR plan can include hardships such as:

> (1) the continued accrual of interest and charges on the debt such that the debt would continue to grow during the 20 or 25 year period; (2) the effect of continually-increasing debt on a debtor's access to credit and on debtor's ability to obtain employment and housing; (3) the effect of "mounting indebtedness, even with a zero or minimal payment" on a debtor's mental and emotional state; and (4) the tax burden if the debt is canceled after 20 or 25 years of participation in the program.

*In re Fern*, 553 B.R. 362, 369 (Bankr. N.D. Iowa 2016), *aff'd,* 563 B.R. 1 (B.A.P. 8th Cir. 2017);

*see also In re Gubrath*, 526 B.R. 863, 871 (D. Colo. 2014) (explaining IBR plans "were only a short-term answer . . . because such payment plans did not even come close to covering the interest on the loans, the debt load simply grows more burdensome as time passes."); *In re Kloos*, No. A08-8060-TJM, 2010 WL 3089722, at *4 (Bankr. D. Neb. 2010) ("For a debtor with little surplus income, a large student loan debt, reasonable expenses, and little likelihood of greater income in the future, the ICRP offers no advantage because the debtor will never be able to make headway against the debt and may face a significant tax burden when the debt is forgiven at the end of the term.").

After completing an IBR plan the Department of Education forgives the balance and the interest of the loan.[13] Under 26 U.S.C. § 108(a)(1) this loan forgiveness can result in taxable income for the borrower under federal and state law.[14] To the extent the borrower is insolvent, meaning that the total of all assets (including exempt assets) are less than the total of all debts, prior to the debt being forgiven, the borrower's insolvency is set off against the forgiven debt and the borrower will only be taxed on the amount by which they are solvent.[15] In contrast, under

---

[13] 34 C.F.R. § 685.209 states, "If a borrower has not repaid a loan in full at the end of the 25–year repayment period under the ICR plan, the Secretary cancels the outstanding balance and accrued interest on that loan No later than six months prior to the anticipated date that the borrower will meet the forgiveness requirements, the Secretary sends the borrower a written notice that includes— (3) General information on the current treatment of the forgiveness amount for tax purposes, and instructions for the borrower to contact the Internal Revenue Service for more information . . ."

[14] If an individual participates in Public Service Loan Forgiveness for ten years, the forgiveness of debt is excluded from gross income and not taxed. 26 U.S.C. § 108(f). Ms. Murphy is not eligible to participate in a Public Service Loan Forgiveness program.

[15] 26 U.S.C. § 108(a)(1) states, "Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if-- . . . (B) the discharge occurs when the taxpayer is insolvent." The definition of insolvent under the 26 U.S.C. § 108(d)(3) states, "For purposes of this section, the term "insolvent" means the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer is insolvent, and the amount by which the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge." As explained in the Federal Tax Coordinator, "The insolvency calculation  and insolvency exclusion limitation both require an examination of the debtor's assets and liabilities for the purpose of determining whether the debtor's net worth turns positive (assets exceed liabilities), i.e., whether assets are freed, as a result of the discharge of indebtedness. . . taxpayers claiming to be insolvent must prove by a preponderance of the evidence—i.e., must prove that it's more likely than not—that they will be called upon to pay an obligation claimed to be a liability, and that the total amount of liabilities so proved exceeds the [fair market value] of their assets." ¶ J-

-23-

26 U.S.C. § 108(a)(1) a debt discharged in bankruptcy is not a taxable event.

The tax consequences at the end of a 20-year or 25-year IBR plan repayment period is relevant to the undue hardship analysis.[16] As the Sixth Circuit explained,

> [R]equiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans. If, at the end of the twenty-five years, the debtor has been unable to repay all the student loans, the remaining debt is canceled and that discharge of indebtedness is treated as taxable income.

*In re Barrett*, 487 F.3d at 364; *see In re Bronsdon*, 435 B.R. 791, 802 (B.A.P. 1st Cir. 2010) ("because forgiveness of any unpaid debt under the ICRP may result in a taxable event, the debtor who participates in the ICRP simply exchanges a nondischargeable student loan debt for a nondischargeable tax debt. Such an exchange of debt provides little or no relief to debtors."); *In re Marshall*, 430 B.R. at 815 ("At the end of the 25–year repayment period, if the debt is cancelled, there are tax consequences for the Debtor. The Debtor would be 81 years old at the end of the 25–year repayment period, and likely still on a fixed income. The tax consequences for someone in that position could be devastating.").

Ms. Murphy is 58. She is close to the average age of retirement. She lacks any realistic

---

7403, Insolvency Exception to Recognition of Debt Discharge Income, 1997 WL 502479. For example, a borrower has student loan debt of $100,000 (the "forgiven debt") and other debt of $80,000 for a total debt of $180,000 as well as assets of $120,000 immediately before the forgiveness of the debt. The extent of the borrower's insolvency is $60,000 because $180,000-$120,000 = $60,000. The taxable income from the forgiveness of debt, therefore, is calculated by taking the forgiven debt - the extent of insolvency, in this example $100,000 - $60,000. In this example, the taxable income is to $40,000. This example assumes no exceptions, exclusions or limitations apply that would change the result. In this example, an alternative method of calculating the taxable income is simply looking at the net worth of the individual excluding the forgiven debt, the borrower's net worth is the amount of taxable income.

[16] Some courts have held that the potential tax consequences due to loan forgiveness are too speculative to be relevant. *See In re Gesualdi*, 505 B.R. 330, 346 (Bankr. S.D. Fla. 2013) ("it is speculative, at best, to guess what the tax laws will be in 25 years."); *Jones v. Bank One Texas*, 376 B.R. 130, 143 n. 11 (W.D. Tex. 2007) ("forecasting such tax liability under whatever tax laws will be in effect in 25 years is sheer speculation."); *In re Coplin*, 2017 WL 6061580, at *14 (Bankr. W.D. Wash. 2017) ("the Plaintiff's tax concern is speculative and based on an assumption that she will fail to repay the loans and that she will acquire sufficient assets to create taxable income under the insolvency provision of 26 U.S.C. § 108.").

potential to increase her income in the foreseeable future. Although it is impossible to know for sure whether forgiveness of her student loans at the end of IBR plan repayment periods would result in tax lability to Ms. Murphy that she could never pay, denying her a student loan hardship discharge and requiring her to participate in IBR plans will leave her with "no assets for extraordinary expenses of [her] later years, or a tax bill to the extent [she] has accumulated any such assets." *In re Abney*, 540 B.R. at 690.

For the foregoing reasons, Ms. Murphy has satisfied the third prong of the Brunner test.

<u>CONCLUSION</u>

In general, it is quite difficult for a debtor to discharge student loans based on undue hardship. Only where the debtor has satisfied the demands of each part of the *Brunner* test will the Court grant a discharge. Ms. Patricia Angelica Murphy has met that burden. The Court therefore will grant Ms. Murphy a discharge of her student loan debt under § 523(a)(8). The Court will enter a separate judgment consistent with this Memorandum Opinion discharging Ms. Murphy's loans as an undue hardship under § 523(a)(8).

Robert H. Jacobvitz
United States Bankruptcy Judge

Date entered on Docket: 6/1/2018

Copy to: Counsel of Record via CM/ECF